UNITED STATES of America

v.

Wilbur JONES, Appellant.

UNITED STATES of America

v.

Claude L. SMITH, Appellant.

UNITED STATES of America

v.

James P. JARVIS, Appellant.

Nos. 72-1479, 72-1593 and 72-1600.

United States Court of Appeals,
District of Columbia Circuit.

Jan. 18, 1973.

Messrs. Robert Gray and Nathaniel P. Breed, Jr., were on the pleading for appellant Jones.

Mr. Aubrey M. Daniel, III, Washington, D. C., was on the pleading for appellants Smith and Jarvis.

Messrs. Harold H. Titus, Jr., U. S. Atty., John A. Terry and James W. Diehm, Asst. U. S. Attys., were on the pleading for appellee.

1. The cases are discussed individually in Part IV of this opinion.

2. D.C.Code § 23-1324(b).

3. 80 Stat. 215 (1966), as amended, 18 D.C. 170, at 174, 469 F.2d 576, at 580 (1972).

4. United States v. Stanley, 152 U.S.App.D.C. 170, at 174, 469 F.2d 576, at 580 (1972).

5. 84 Stat. 473 (1970).

6. See H.R.Rep. No. 91-907, 91st Cong., 2d Sess. 185-87 (1970).

7. The pertinent subsection provides that a person who has been convicted and sentenced "*shall be detained* unless the judicial officer finds by clear and convincing evidence that (1) the person is not likely to flee or pose a danger to any other person or to the property of others, and (2) the appeal . . . raises a substantial question of law or fact likely to result in a reversal or an order for a new trial." D.C.Code § 23-1325(c). (Emphasis added.)

BAZELON, Chief Judge, dissenting:

Each of these defendants was convicted of a D.C.Code offense,[1] and each moved for release pending appeal under D.C.Code § 23-1325(c). The trial judges denied the motions; my colleagues uphold the denials. I recognize that we are required to affirm if the trial judge's holding is "supported by the proceedings below."[2] In these cases however, I do not find the denials to be properly supported; in my view the trial judges incorrectly applied the statutory formula governing release.

I.

Prior to the passage of the D.C.Code bail revisions, release for both D.C.Code and U.S.Code offenders was governed by the federal Bail Reform Act of 1966,[3] which established a preference for release pending appeal.[4] In passing the D. C. Court Reform and Criminal Procedure Act of 1970,[5] Congress made clear its intention to reverse that preference;[6] the result was D.C.Code § 23-1325,[7] which directed the courts to take a considerably harsher stance in ruling on motions for release pending appeal.[8]

8. It was that considerable difference that prompted this court's opinion in United States v. Thompson, 147 U.S.App.D.C. 7, 452 F.2d 1333 (1971). We noted there that the D.C.Code bail provisions single out a "powerless, voteless minority"—the residents of the District of Columbia—for special, and harsher, treatment. Such classification, we said, "must be subjected to the strictest possible review." Applying that strict scrutiny to Thompson's motion, we held that a limiting interpretation of the statute was necessary to avoid unconstitutional discrmination.

Although *Thompson* did not concern the situation presented here—application of the D.C.Code bail provision to D.C.Code offenders—that opinion is instructive in this context. In *Thompson* we recognized that the discrimination imposed by the harsher release conditions may be permissible when Congress is dealing with local crimes unique to D.C.

Not all of the offenses in the D.C.Code are uniquely local in character. United States v. Bland, 153 U.S.App.D.C. 254,

Nonetheless, the statute does permit release in certain circumstances; it sets forth two factors relevant to the question of release:

1) The likelihood that the appellant will flee or pose a danger to persons or property; and

2) The likelihood of reversal on appeal.

In each of these cases, the trial judge considered only one of the two factors. In the Smith and Jarvis cases, the judge[9] considered only the first factor; since he was unable to find that the defendants were not likely to flee or pose a danger, the judge did not discuss the substantiality of the appeal.[10] Jones' motion represents the converse; there the trial judge could not find a likelihood of reversal, and so denied release with no consideration of the risk of flight or danger. I believe that both judges erred. For the reasons set forth in Parts II and III of this opinion, I think the statute requires consideration of both likelihood of flight or danger and the substantiality of the appeal in every case.

## II.

Failure to analyze the substantiality of the appeal—as occurred in the Smith and Jarvis cases—is problematic for two reasons. First, it assumes that the two statutory factors bearing on release are independent of each other. In fact, they are not independent. The likelihood that a convicted person will flee or pose a danger to persons or property is often directly related to the validity of his conviction. Thus it is normally impossible to make an adequate determination as to the risk of flight or danger without paying some attention to the strength of the appeal.

The substantiality of the appeal should be a particularly important consideration when the issues raised on appeal directly concern whether or not the defendant committed the offense for which he was convicted. The case of Smith, one of the movants here, is illustrative. Smith is appealing his conviction in the murder of Elroy Williams. This murder appears to have been a significant factor in the trial judge's determination as to Smith's dangerousness. But Smith's appeal raises a doubt as to whether he committed murder at all. Since the judge failed to consider the appeal in ruling on the motion for release, he ignored factors which challenge an important premise of his decision.

Second, consideration of the appeal is mandated by the basic rationale for permitting release on appeal—the concern that a person may be confined under an erroneous judgment while the appeal is pending.[11] Because of this concern,

---

at 256, note 3, 472 F.2d 1329, at 1331, note 3 (1972) (Statement of Bazelon, C. J.). Acting under its "special maritime and territorial jurisdiction," Congress has enacted federal statutes covering many of the "street crimes" included in the D.C. Code. To treat a "local" offender more harshly than a "maritime or territorial" offender who has committed a similar offense may constitute the same unjustifiable discrimination that concerned the court in *Thompson*. Therefore, in cases involving D.C.Code provisions that are substantially similar to U.S.Code offenses, this court may be required to interpret the D.C.Code bail provisions in such a way as to avoid unconstitutional discrimination.

9. Smith and Jarvis were tried as codefendants; thus their motions for release were both made to the same judge.

10. In his "Statement of Reasons Pursuant to Rule 9(b)," the judge did make a generalized statement that he could not recall any "substantial error" in the trial of Smith and Jarvis. He did not deal with any of the specific points of error raised by the appellants. He stated that such a discussion was unnecessary.

11. The fear is that the defendant will be "unnecessarily incarcerated and separated from his family." Banks v. United States, 134 U.S.App.D.C. 254, 257, 414 F.2d 1150, 1153 (1969). *Cf.* Bandy v. United States, 81 S.Ct. 197, 5 L.Ed.2d 218 (Douglas, Circ. Justice, 1960). Although these cases arose under U.S.Code bail provisions, the possibility of unnecessary incarceration exists regardless of the bail statute being applied.

judges should be more receptive to a motion for release where the movant raises substantial doubt about the validity of his conviction. "[W]here compelling grounds for reversal are to be argued, this court has been especially reluctant to deny release pending appeal." [12]

The D.C.Code provisions do not preclude such consideration. The legislative history indicates that the preference for detention in the code stems from the presumption that a conviction is "correct in law" and that a person who has been sentenced to jail is "dangerous." [13] Where the appeal raises substantial doubt about the conviction, these presumptions, and the preference for detention, are diminished. "There may be an offsetting consideration where the appellate court can discern that the papers demonstrate . . . that [appellant's] claims are so substantial as to undercut any presumption that might attach to the verdict and judgment as indicators that he is guilty of the violence charged in the case at bar." Banks v. United States, 134 U.S.App.D.C. 254, 259, 414 F.2d 1150, 1155 (1969) (Leventhal, J., dissenting.)

Obviously the trial judge cannot make this kind of analysis if he fails to review the substantiality of the appeal.

## III.

The problem posed by the trial judge's decision on Jones' motion—analysis of the substantiality of the appeal, but failure to consider the likelihood of flight or danger—is that such a failure provides an incomplete record for the appellate court. Under D.C.Code § 23–1325 (d), this court must make a *de novo* finding as to the likelihood of reversal in reviewing motions for release. If we should find the appeal does raise a substantial question likely to result in reversal, we will need some information on the risk of flight or danger in order to rule on the motion for release. Where the trial judge makes no finding on this point, remand may be necessary. Such action is inefficient, unnecessary, and, as I said recently in United States v. Stanley,[14] an impermissible infringement on the movant's personal freedom.

## IV.

For these reasons I believe proper consideration of motions for release under D.C.Code § 23–1325(c) requires analysis of both statutory factors in every case. Applying this analysis to the three motions at hand, I would dispose of them as follows: [15]

*Smith*—Claude L. Smith was convicted of second degree murder [16] and carrying a deadly weapon.[17] The convictions arose out of an argument on July 3, 1971, in which Smith shot and killed Elroy Williams, using a gun he had obtained shortly before from James P. Jarvis.

Smith's defense at trial was self-defense; he maintained that he had shot Williams only after Williams lunged at him with a razor. The closest eyewitnesses on this crucial issue were two friends of Smith, Jerome Jackson and Frank Twitty. Both had accompanied Smith to the fatal confrontation with Williams. However, neither was charged

---

12. United States v. Long, 137 U.S.App. D.C. 275, 277, 422 F.2d 712, 714 (1970).

13. H.R.Rep. No. 91–907, 91st Cong., 2d Sess. 186–87 (1970). The report also suggests that detention is favored because of "whatever deterrent effect remains in the criminal law." Whatever deterrent effect there is can certainly not be protected by incarcerating people who have not been validly convicted.

14. 152 U.S.App.D.C. 170, 469 F.2d 576 (1972) (dissenting opinion). *Stanley* involved a motion for release under the U.S.

Code, but the delay caused by a remand to complete the record should be avoided regardless of which statute governs the case.

15. Where the trial judge's decision is not supported by the proceedings below, this court is authorized to remand or to release on recognizance, bond, or conditions. D.C.Code §§ 23–1324(b), 23–1321(a).

16. D.C.Code § 22–2403.

17. D.C.Code § 22–3204.

by the government or even threatened with charges in connection with the shooting during the nine months between the incident and the trial.

At the trial, Jackson testified for the government that Williams did not have a razor when he was shot. Twitty was apparently prepared to testify that Williams did. Before Twitty took the stand, however, the prosecutor met him outside the courtroom and threatened him with prosecution if he testified for the defense.[18] As a result, Twitty exercised his Fifth Amendment privilege and did not testify.

The prosecutor maintained that his talk with Twitty was a manifestation of his duty "as an officer of this court" to warn the witness of a potential prosecution. This is a questionable proposition. The language used was apparently more of a threat than a warning; and the prosecutor's zeal to do his duty did not extend to Jackson, who was apparently given no "warning" before testifying for the prosecution. In effect, the prosecutor made a selective grant of immunity which preserved a significant piece of prosecution testimony but obstructed the defense's exculpatory proof.

"The right to offer the testimony of witnesses . . . is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). The prosecutor's interference with that right raises a substantial question as to whether he has carried out the duties imposed on him under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Since we have not yet received the government's brief or heard oral argument in this case, I cannot say with certainty that the prosecutor's conduct compels a reversal. However, the Fourth [19] and Ninth [20] circuits have held, in somewhat analogous circumstances, that prosecutorial action making witnesses unavailable to the defense constitutes a denial of due process of law. This court has explicitly recognized the difficult problem raised by a selective grant of immunity such as that given here.[21] Thus I believe there is a sufficient question on appeal to meet the statutory requirement for release.

As to the likelihood of flight or danger, I note that Smith has extensive family ties in the community; he has been employed by his father, and will continue to be if released; he has a good record of appearance during previous periods of release; and none of his convictions prior to this one involved a "dangerous crime" or "crime of violence" under D.C.Code § 23–1331(3) and (4).

In light of these factors, and the likelihood of reversal on appeal, and recog-

---

18. With the jury absent from the courtroom, Twitty was questioned on this by defense counsel and the court:
   [Defense Counsel]: Do you remember telling me, sir, that you had been told by the Assistant United States Attorney, Mr. Hoffman, in this matter, that if you testified, you were told this yesterday, that if you testified in this case you would be charged with CDW, obstuction of justice, and as a principal in a murder?
   [Twitty]: You're right.
   THE COURT: Did he say you could be, or would be?
   [Twitty]: Would be.
   T. 242–43.

19. Bray v. Peyton, 429 F.2d 500 (4th Cir. 1970).

20. United States v. Mendez-Rodriguez, 450 F.2d 1 (9th Cir. 1971).

21. In Earl v. United States, 124 U.S.App. D.C. 77, 361 F.2d 531 (1966), the court held that the government could not be compelled to grant immunity to a defense witness. However, the opinion noted that "We might have quite different, and more difficult, problems had the Government in this case secured testimony from one eyewitness by granting him immunity while declining to seek an immunity grant for [a defense eyewitness] . . . ." The Earl case involved statutory immunity procedures under 18 U.S.C. § 1406 (1964); the situation in the present case is analogous, although statutory immunity is not involved.

nizing that the questions raised on appeal tend, in Judge Leventhal's phrase, to "undercut any presumption that might attach to the verdict and judgment as indicators that he is guilty of the violence charged in the case at bar." [22] I think Smith's release on appropriate conditions is justified under the statute.

*Jarvis*—James P. Jarvis, Smith's co-defendant, was convicted of second degree murder [23] and carrying a deadly weapon.[24] The government's theory was that Jarvis aided and abetted Smith in the murder of Williams. Obviously the prosecutor's obstruction of the defense's case raises the same likelihood of reversal in Jarvis' appeal that it raises in Smith's.

Although Jarvis has a number of disorderly conduct and other misdemeanor convictions, there is no indication in his record that he would pose a danger to the community if released. Prior to his conviction he ran two businesses in the District of Columbia. His attorney has made impressive arrangements for Jarvis to live and work with his step-father in a stable atmosphere pending the appeal. This evidence, together with the doubt as to Jarvis' guilt of the present charges, creates a convincing case that Jarvis is not likely to flee or pose a danger if he is released under appropriate conditions.

*Jones*—Wilbur Jones was convicted of manslaughter [25] in the shooting of Garland Shorter. On April 14, 1971, Jones saw Shorter and two other men tampering with a car in front of Jones' home. Taking a shotgun, Jones went outside and told the three to leave. An argument ensued, and Jones walked back toward the house. When he reached the porch, he turned and fired one shot which killed Shorter. After instructing a child in the house to call the police,

Jones fled the scene. He turned himself in to the police about an hour later.

Jones' defense at trial was self-defense; he said that he fired the shot because he had seen Shorter pull a gun. The only eyewitness other than Jones was a twelve-year-old girl. Although she appeared as a government witness, she first testified that Shorter did pull a gun on Jones; under questioning by the prosecutor, she said there was no gun; on further questioning, she reversed and contradicted herself several times. It came out during the questioning that she had given statements prior to the trial to police officers and to a public defender attorney. In one statement, she said Shorter had a gun; in the other she said he did not.

Jones contends on appeal that this evidence is not sufficient to meet the government's burden of eliminating all reasonable doubt to the question of self-defense. United States v. Bush, 135 U.S.App.D.C. 67, 416 F.2d 823 (1969); Kelly v. United States, 124 U.S.App. D.C. 44, 361 F.2d 61 (1966). It is obvious from the trial transcript that this point troubled the trial judge as well; eventually, however, he resolved his doubts in favor of the government and allowed the case to go to the jury. Although I have reached no final view of the matter (the government's brief has not yet been filed), I believe the trial judge's decision raises a substantial question.

The *Bush* case, *supra*, is similar to this one. There, as here, the government could produce only one witness (other than the accused) who saw the shooting. There, as here, the witness testified that the decedent brandished a weapon just before he was shot by the defendant. There, as here, the witness was confronted with a prior statement which "in one respect appeared to be in conflict with

---

22. Banks v. United States, 134 U.S.App. D.C. 254, 259, 414 F.2d 1150, 1153 (1969) (dissenting opinion).

23. D.C.Code § 22–2403.

24. D.C.Code § 22–3204.

25. D.C.Code § 22–2405.

his testimony." [26] On that basis, this court held that the jury could not reasonably have negated the possibility of self defense. "Such a finding must have been based upon speculation, surmise, and the repudiation by the government of the case made by its own witnesses." 135 U.S.App.D.C. at 69, 416 F.2d at 825.

In Jones' case, the repeated contradictions by an obviously confused and frightened twelve-year-old witness render her testimony all but meaningless. Thus the only evidence the jury had to refute Jones' version of the shooting was whatever negative inference they might have drawn from the prosecutor's attacks on Jones' credibility. Accordingly, there is a substantial question whether the case was sufficient to go to the jury. In a recent narcotics case, this court stated:

> While it may be that the jury was well within its province in discrediting appellant's version of what happened, the necessity remains for the Government to have adduced proof adequately supporting the jury's verdict.[27]

The trial judge's order denying the motion for release indicates that one reason he let the case go to the jury was the evidence that Jones concealed his gun and fled the scene after the shooting. This court has repeatedly noted that flight is an "unreliable indication"[28] which may be "explained by terrorized innocence as well as by a sense of guilt."[29] Flight evidence is a particularly weak reed in Jones' case, since he instructed someone to call the police immediately after the incident and turned himself in approximately one hour later. This tenuous corroboration does not seem to eliminate the substantial question concerning the sufficiency of the evidence in this case.

There remains the question of the likelihood that Jones will flee or pose a danger if released pending appeal. As stated above, the trial judge made no reference to this question in denying the motion for release. Although in many cases such an omission would require a remand, that is not necessary here. For one thing, there is some information in the record concerning the defendant's residence, employment, and criminal record.[30] More important, the trial transcript indicates that the trial judge permitted Jones to be released pending sentencing. Under D.C.Code 23–1325(b), that ruling required the judge to find "by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or to the property of others." This is, of course, precisely the finding required to authorize release pending appeal.

In light of this finding by the trial judge, and in light of the substantial doubt raised by the appeal as to Jones' guilt, I believe his motion for release pending appeal should be granted.

---

26. 135 U.S.App.D.C. at 69, 416 F.2d at 825. Apparently, however, the witness in *Bush* held to his testimony from the stand even when confronted with the prior statement.

27. United States v. Harling, 150 U.S.App. D.C. 87, 89, 463 F.2d 923, 925 (1972).

28. United States v. Harris, 140 U.S.App. D.C. 270, 435 F.2d 74, note 48 (1970), citing United States v. Vereen, 139 U.S. App.D.C. 34, 429 F.2d 713 (1970) and Austin v. United States, 134 U.S.App. D.C. 259, 414 F.2d 1155 (1969).

29. Austin v. United States, *supra* note 34, 134 U.S.App.D.C. at 261, 414 F.2d at 1157.

30. Jones is a resident of the District of Columbia; T. 197; he was employed prior to being convicted and again after the conviction while released pending sentencing. Sentencing T. 2. His criminal record consists of "one year he served back in . . . the early 50's." Sentencing T. 2.